IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HIGH FIVE VENTURES, INC.** | : | **Civil No. 1:13-CV-2334** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SPORTSMANSLIQUIDATION.COM,** | : | |
| **LLC and MUSKEGON HUNTING** | : | |
| **PRODUCTS, LLC** | : | |
| | : | **Judge Sylvia H. Rambo** |
| **Defendants** | : | |

## M E M O R A N D U M

In this equitable receivership action, the Receiver has moved the court to exercise its equitable power by applying a portion of the United States Bankruptcy Code ("Bankruptcy Code") to reduce one of the claims against the insolvent Defendants from $1,922,140 to $329,482 for the benefit of all claimants. For the reasons that follow, the court will not apply the Bankruptcy Code to this equitable receivership, but will exercise its equitable power to reduce the claim to $1,131,340 to prevent a double recovery by the claimant.

## I.       Background

The parties do not dispute any material facts, which are based entirely on the pleadings and other submissions of the parties, and are summarized as follows.

### A.       Facts

Defendant Sportsmansliquidation.com, LLC ("Sportsmans") operates a discount chain of retail stores that sells "hunting, fishing and other outdoor recreation products" in several states. (Doc. 1, ¶ 5.) Defendant Muskegon Hunting

Products, LLC ("Muskegon") sells outdoor sports clothing, and also operates a retail store in Michigan. (Doc. 3, ¶ 3.)  Sportsmans is one of Muskegon's primary customers. (*Id*.)

On January 1, 2013, Sportsmans provided a line of credit to Muskegon, which ultimately totaled $190,712, pursuant to which Muskegon granted Sportsmans a first priority lien on all of Muskegon's assets. (Doc. 1, ¶¶ 14-15, 18.)  On March 4, 2013, Sportsmans received a loan from G&P Entertainment, LP ("G&P"), in the amount of $1,750,000, in exchange for a promissory note which granted G&P a first priority lien on all of Sportsmans' assets. (*Id*. at ¶¶ 7-8.)  On August 23, 2013, Plaintiff High Five Ventures, Inc. ("Plaintiff") entered into an assignment agreement with G&P to acquire all of its rights under the loan to Sportsmans. (*Id*. at ¶9.)  Then, on September 4, 2013, Plaintiff entered into a separate assignment agreement with Sportsmans to acquire its rights under the line of credit it provided to Muskegon. (*Id*. at ¶ 16.)  Sportsmans and Muskegon subsequently defaulted on the loans and were unable to repay any of the $1,750,000,  or $190,712, due, respectively, despite Plaintiff's demands for payment. (*Id*. at ¶¶ 10-13, 17-20.)

Plaintiff initiated this action by filing a complaint against Defendants on September 6, 2013. (Doc. 1.)  In its complaint, Plaintiff asserted two counts for breach of contract, one against each Defendant, for defaulting on the two loan agreements. (*Id*.)  On September 10, 2013, Plaintiff  moved for, and Defendants consented to, an emergency motion to appoint a receiver. (Doc. 3.)  On September 12, 2013, the court entered an order appointing Compass Advisory Partners, LLC as the receiver ("Receiver") for Defendants "for the purpose of managing, protecting, preserving, operating and selling some or all of [Defendants' assets] . . . for the

benefit and protection of all creditors." (Doc. 6, ¶ 7.) The Receiver subsequently sold all of Defendants' assets and paid Defendants' known secured creditors, including Plaintiff, in full. (Doc. 20, ¶¶ 3-4.) The Receiver then established a claims process for Defendants' unsecured creditors, of which more than seventy submitted claims, including Nerangis Properties, LLC ("Nerangis"), the lessor of Sportsmans' former retail space in Winchester, Virginia. (Doc. 33-2.) Nerangis submitted a claim for $1,922,140 in damages related to Sportsmans' default on the commercial lease between Nerangis and Sportsmans, which includes amounts for rent through the remainder of the lease as well as costs associated with reletting the property. (*Id*.)

The total amount of unsecured claims submitted to the Receiver was $3,384,093.22 (Doc. 33, ¶ 5), and the Receiver estimates it will have approximately $85,000 available to distribute among the claimants (*id*. at ¶ 6). Such distribution will take place on a pro rata basis after payment of any remaining administrative fees, at which point the receivership will be concluded. (*Id*. at ¶ 7.) As part of the distribution to the claimants, the Receiver has moved the court to reduce the Nerangis claim from $1,922,140 to $329,482, which would represent the pre-receivership damages plus one year of future rent. (*Id*. at ¶¶ 13-16.) Nerangis opposes the instant motion and requests that it receive a pro rata distribution of its full claim, just as all the other unsecured creditors will receive their pro rata distributions. (Doc. 36, p. 14 of 14.)

Nerangis's response was filed on March 2, 2015 (*id*.), and to date the Receiver has not filed a reply. Thus, this matter is ripe for consideration.

## II.          **Discussion**

The appointment of a federal receiver is an equitable remedy governed by Rule 66 of the Federal Rules of Civil Procedure.  Rule 66 states that "the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule."  Fed. R. Civ. P. 66.  Because the Middle District of Pennsylvania has no local rule governing equitable receiverships, historical federal practice will control.

"[A] primary purpose of equity receiverships is to promote orderly and efficient administration of the estate . . . for the benefit of creditors."  *Marion v. TDI Inc.*, 591 F.3d 137, 148 (3d Cir. 2010) (quoting *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986) (alterations in original); *see also Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 795 (6th Cir. 2009) ("[T]he purpose of a receiver [is] to marshal the receivership entities' assets . . . so that the assets may be distributed to the injured parties in a manner the court deems equitable.").  A district court supervising a receiver with equitable powers has wide discretion in determining the appropriate relief.  *See SEC v. Black*, 163 F.3d 188, 199 (3d Cir. 1998) (citing *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992)); *SEC v. Infinity Group Co.*, 226 F. App'x 217, 218 (3d Cir. 2007) ("District [c]ourts have wide equitable discretion in fashioning distribution plans in receivership proceedings.") (citations omitted).  It is within the equitable discretion of a district court to approve a receiver's distribution plan, "provided it is 'fair and reasonable.'" *SEC v. Byers*, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009) (quoting *SEC v. Wang*, 944 F.2d 80, 81 (2d Cir. 1991).  "Because the Receiver is a fiduciary and officer of [the c]ourt, [the c]ourt may and does give some weight to the Receiver's judgment of the most fair and equitable method of

distribution." *Commodity Futures Trading Comm'n v. Eustace*, Civ. No. 05-2973, 2008 WL 471574, *5 (E.D. Pa. Feb. 19, 2008).

"Generally, if government action will deprive an individual of a significant property interest, that individual is entitled to an opportunity to be heard." *Elliott*, 953 F.2d at 1566 (citing *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). "However, a hearing is not required if there is no factual dispute." *Id.* (citing *Codd v. Velger*, 429 U.S. 624 (1977)) (per curiam). "In granting relief, it is appropriate for the district court to use summary proceedings." *Id.* (citing *Hardy*, 803 F.2d at 1040); *see Black*, 163 F.3d at 199 (compiling cases finding that summary proceedings in an equitable receivership are appropriate). "A summary proceeding reduces the time necessary to settle disputes, decreases litigation costs, and prevents further dissipation of receivership assets." *Elliott*, 953 F.2d at 1566 (citing *SEC v. Wencke*, 783 F.2d 829, 837 (9th Cir. 1986), *cert. denied*, 479 U.S. 818 (1986)); *see also United States v. Arizona Fuels Corp.*, 739 F.2d 455, 460 (9th Cir. 1984). Because the parties do not dispute any material facts, the court will use summary proceedings to dispose of the receivership.

Here, the Receiver has presented the court with a pro rata plan of distribution of the proceeds of the sale of Defendants' assets to Defendants' unsecured creditors. The case law makes it "quite clear that pro rata distributions are the most fair and most favored in receivership cases." *Byers*, 637 F. Supp. 2d at 176. The court agrees that a pro rata distribution is equitable in this situation, and none of the claimants, including Nerangis, object to this method of distribution. Therefore, the only issue to be resolved is whether the Receiver's instant motion to limit Nerangis's claim is equitable.

## A.   <u>Application of the Bankruptcy Code</u>

In the instant motion, the Receiver first argues that the court should apply Section 502(b)(6) of the Bankruptcy Code to limit Nerangis's claim.  (Doc. 33, ¶11; *see* 11 U.S.C.A. § 502(b)(6) .)  Application of Section 502(b)(6), the Receiver contends, would cap Nerangis's claim at the value of Nerangis's pre-receivership damages, plus one year of future rent, or a total of $329,482.  (*Id.* at ¶ 13.)  Nerangis argues in response that the current proceeding is an equitable receivership, not a bankruptcy, and that there is no authority for applying a single section of the Bankruptcy Code to an equitable receivership.  (Doc. 36, pp. 8-11 of 14.)

While the court recognizes that it has wide discretion to fashion an equitable plan of distribution, and gives weight to the recommendation of the Receiver, the court agrees with Nerangis that application of a single section of the Bankruptcy Code to a non-bankruptcy proceeding would be inappropriate and ultimately inequitable.  Arbitrarily choosing a section of an unrelated statute to apply to the receivership would serve only to inequitably reduce the otherwise valid claim submitted by only one of the more than seventy claimants.  Such a result would fly in the face of "the fundamental rule, that equality is equity," *U.S. Rubber Co. v. Am. Oak-Leather Co.*, 181 U.S. 434, 453 (1901), and would contravene the court's order appointing the receiver and charging it with disposing of Defendants' assets "for the benefit and protection of *all* creditors."  (Doc. 6, ¶ 7) (emphasis added).  Therefore, the court will not apply Section 502(b)(6) of the Bankruptcy Code to limit Nerangis's claim.

### B.   Nerangis's Ability to Mitigate Loss

The Receiver also argues in support of its motion to limit Nerangis's claim that as a landlord, Nerangis is in a unique position, unlike Defendants' other unsecured creditors, to mitigate its losses under the lease with Sportsmans by reletting the premises. (Doc. 33, ¶ 9.) Nerangis argues in response that it has no duty to mitigate its losses under a commercial lease and is entitled to the full amount of its claim. (Doc. 36, pp. 11-12 of 14.)

The court agrees with Nerangis that it is under no duty to mitigate its losses pursuant to a commercial lease. The lease between Sportsmans and Nerangis purports to be governed by the laws of the Commonwealth of Virginia. (*See* Doc. 37, ¶ 25.11.) Virginia courts have "clearly held that a commercial landlord ha[s] no duty to mitigate damages when a tenant abandons a lease in the middle of a term." *Laskin Road Assocs., L.P. v. Capitol Indus., Inc.*, Civ. No. 2:07-CV-103, 2007 WL 1655336, *8 (E.D. Va. June 5, 2007) (citing *Crowder v. Virginian Bank of Commerce, Inc.*, 127 Va. 299, 303 (1920)).[1]  Under the terms of the lease, Nerangis has the option upon Sportsmans' default to either (a) relet the premises and collect from Sportsmans the difference between the remaining rent due under the lease, plus costs associated with reletting the premises, minus any rents received from the new tenant, or (b) leave the premises vacant and collect from Sportsmans the total remaining rent due through the end of the lease term. (*See* Doc. 37, ¶ 19.2.)

---

[1]  The court notes that while there is currently no conflict of laws argument before the court, and no reason to invalidate the choice of the parties to the lease to have Virginia law apply to any disputes arising under the lease, the result would be the same under Pennsylvania law, as the Pennsylvania Supreme Court has unequivocally held that non-breaching landlords in commercial leases have no duty to mitigate. *See Stonehedge Square Ltd. P'ship v. Movie Merchs., Inc.*, 715 A.2d 1082, 1084 (Pa. 1998) ("[W]e now hold that a non-breaching landlord whose tenant has abandoned the property in violation of the lease has no duty to mitigate damages.").

Therefore, Nerangis has the option to relet the premises and mitigate its loss, but is under no obligation to do so, and the court will not independently impose such an obligation.

### C.   Double Recovery

Nerangis's claim, as submitted to the Receiver, includes amounts for both the remaining rent due from Sportsmans for the remainder of the lease term, as well as costs related to reletting the property, should Nerangis decide to do so. (*See* Doc. 33-2.) Nerangis did not include in its claim, however, a reduction of the costs to relet the property in the amount of rents to be received from future tenants, which is required under its lease with Sportsmans. (*See* Doc. 37, ¶ 19.2.) Such a reduction for rents received from a subsequent tenant is required because, under Virginia law, a rent acceleration provision that binds a tenant to pay future rents regardless of whether the property is relet is an unenforceable penalty that "potentially requires payment grossly in excess of actual damages" and "provides the landlord with a potential windfall." *Teachers' Ret. Sys. v. Am. Title Guaranty Corp.*, 38 Va. Cir. 316, 1996 WL 1065475, *2 (Va. Cir. Ct. Jan. 12, 1996).[2]

The court cannot equitably allow Nerangis to submit a claim for damages that it would not be entitled to under either its lease with Sportsmans or applicable law. Nerangis itself admits in its brief in opposition to the instant motion

---

[2] Once again, the court notes that the result would be the same under Pennsylvania law. In Pennsylvania, the landlord in a commercial lease must choose between repossession and actual damages or acceleration of rent. *See Onal v. BP Amoco Corp.*, 275 F. Supp. 2d 650, 668 (E.D. Pa. 2003) (citing *H.A. Steen Indus., Inc. v. Richer Commc'ns, Inc.*, 314 A.2d 319, 321-22 (Pa. 1973)). "This rule prevents a non-breaching lessor from obtaining the 'double recapture' that would result from a rule allowing a landlord to possess the property, and possibly reap a profit from renting or selling it, at the same time that he collects rent from a breaching tenant." *Id.* (citing *Finkle v. Gulf & W. Mfg. Co.*, 744 F.2d 1015, 1021 (3d Cir. 1984)).

that it has been unable to relet the property for over a year, despite enlisting the services of a commercial real estate broker.  (Doc. 36, pp. 12-13 of 14.)  The court sees no reason why Nerangis should be entitled to speculative costs related to reletting the property when it has not, in fact, relet the property.  The only equitable solution under the present circumstances is to allow Nerangis to maintain its claim for future rents due, which Sportsmans is contractually bound to pay, and to remove from the claim any amounts associated with a potential future reletting of the premises.  Therefore, the court will use its equitable discretion to disregard the $790,800 in damages from Nerangis's itemized claim associated with reletting the premises (Doc. 33-2), and reduce its overall claim to $1,131,340.

## IV.    Conclusion

The court recognizes that it has wide equitable discretion to fashion an appropriate plan of distribution in an equitable receivership.  The court will not, however, haphazardly apply a single section of the Bankruptcy Code to the claim of one of Defendants' more than seventy unsecured creditors to reduce that creditor's claim by more than eighty percent.  Thankfully, such action is not necessary in the present situation in order to achieve an equitable result for Defendants' creditors.  Equity will be served by placing Nerangis in the same position it would have been in under the terms of its lease with Sportsmans, which will achieve the same result that Nerangis could have pursued in an action at law.  Therefore, Nerangis's claim will be reduced to $1,131,340, which disregards any damages associated with reletting the premises and avoids a potential double recovery.

An appropriate order will issue.

s/Sylvia H. Rambo
United States District Judge

Dated:  April 28, 2015.